IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

DEVONNIA HORNER                                    PLAINTIFF

v.                          No. 3:23-cv-108-DPM

CHARLES WARREN and
JUDY WARREN                                        DEFENDANTS

### Memorandum Opinion and Order

The deep, disputed issue is what happened when Ms. Horner encountered Mr. Warren when she went to look at a vacant rent house at 1304 South Culberhouse in Jonesboro.  The background is agreed.

Ms. Horner was a single working mother with two young children, a son (then seven) and a daughter (then two).  She was in her late twenties.  The family had been living in government housing, but was approved for their own place with a Section 8 voucher.  She had a deadline to find that place.  The South Culberhouse property appealed to her when she saw it advertised on Facebook.  It was an older house with an open floorplan.  It was across the street from her son's school, had three bedrooms, and a shed, which would be handy for her children's toys.  Ms. Horner called, spoke with Mrs. Warren, and made an appointment to tour the house.

Mr. and Mrs. Warren owned this house and seven other rental properties.  For many years they had participated in HUD's Section 8

program, accepting vouchers for tenants' monthly rent. They had a solid track record with the local housing authority, which administers this HUD program. Mrs. Warren is a retired private school superintendent. She handled the business side of their rental property—advertising vacancies, reviewing applications, doing background checks, and handling money. Mr. Warren was retired from maintenance work at several large plants. His last job was leading a five-man refrigeration team at the Nestle plant in Jonesboro. He went through sexual harassment training there. He learned that you're not supposed to touch others or say inappropriate things. Mr. Warren didn't enjoy not working. After a few weeks of it, the Warrens bought their first rent house with some retirement savings, and grew from there. They also started managing rental property for others. At the time of the trial, they managed twenty-three properties including their eight houses. Mr. Warren was in his early seventies when he showed Ms. Horner the house.

Though Mrs. Warren often met prospective tenants with Mr. Warren, she wasn't there when Ms. Horner toured 1304 South Culberhouse. (Mrs. Warren was homeschooling a grandchild that fall.) Ms. Horner arrived with her two children as another prospective tenant was leaving. Mr. Warren greeted them on the front porch and showed them in. Here the testimony about the interaction between Mr. Warren and Ms. Horner diverged sharply. Among other things, it was agreed,

though, that Ms. Horner and her children were there for about thirty minutes. She looked over the house, shed, and backyard. She filled out an application. Her children were excited, running around the empty house in circles. (Remember the open floor plan.) At one point, Ms. Horner's son kept jumping at some just-installed window blinds. He pulled the end of one down. At another point, while Ms. Horner focused on the application, her two-year-old daughter somehow got through the front storm door and wandered to the street. Mr. Horner ran out, stopped traffic, returned the little girl, and brought her back inside.

Back to the divergent stories. According to Mr. Warren, he waited in the main part of the house, while Ms. Horner looked around on her own. That was his usual drill. He did not touch her. He did not say anything inappropriate to her. Mr. Warren's attention was on the rambunctious children. Their behavior prompted him to tell Mrs. Warren that evening that he didn't want to rent to this family. (Mrs. Warren overruled him. More to come on that.) According to Ms. Horner, he showed her around the house and shed. He guided her with his hand on her lower back — which she didn't mind or find offensive. As she was filling out the application at the kitchen counter, though, she turned and he had "eased up" on her. He hugged her, saying "I sure would like to suck on those titties." His elbows touched her

breasts as the hug broke. And he took her hands and grazed his penis with one of them. She froze. Then she left.

\*

This was a bench trial. I must judge the parties' credibility, considering all the circumstances, as I routinely instruct juries to do. No one other than Mr. Warren and Ms. Horner can know exactly what happened between them because no one else — other than children who had play on their minds — was there. For several reasons, I believe Ms. Horner. It is more likely than not that the encounter occurred as she described.

First, a property owner showing a prospective tenant around briefly is common. That an older southern man would guide a woman with brief touches on the back is hardly remarkable; Ms. Horner didn't think anything about this.

Second, Ms. Horner told others almost immediately that Mr. Warren had harassed her. Soon after she left the home, she texted a close friend about the troubling encounter. She also tried to call her son's father. She texted him, too, when he didn't answer. That same day, she went to the Jonesboro Police Department and made a report. She did the same at the local housing authority. A few weeks later, she made a similar report to HUD. It was agreed that the Court can consider the timing of all those reports in making the credibility call. And Ms. Horner testified, without objection, that the bones of her same-

–4–

day reports, and the prompt HUD report, were consistent with her trial testimony about what happened.

Last, Ms. Horner wanted to rent *that* house but didn't. It was more convenient, less expensive, and had more amenities than the place she rented a month or so later. She was on a deadline. There was an exchange of telephone calls and voicemails after the tour. Mrs. Warren overruled Mr. Warren's concerns about the children damaging the property and offered it to Ms. Horner. Ms. Horner talked with Mr. Warren by telephone, hoping he would apologize. He didn't say anything about their encounter. Ms. Horner never responded to Mrs. Warren's further inquiries about whether she wanted to take the lease. Mrs. Warren eventually moved on to other prospects. I credit Ms. Horner's testimony that she didn't want to live in a place to which Mr. Warren had a key. Her passing up this desired new home supports the conclusion that their encounter turned bad.

\*

The Fair Housing Act forbids sex-based discrimination in the renting of dwellings. 42 U.S.C. § 3604(b). A hostile environment created by sexual harassment violates the statute. *Quigley v. Winter*, 598 F.3d 938, 946 (8th Cir. 2010). In considering whether Ms. Horner has proved her claim by a preponderance of the evidence, the Court has considered all the circumstances, guided by the long-settled Title VII law about what is, and is not, a hostile environment. A single encounter

is usually insufficient. *Hairston v. Wormuth*, 6 F.4th 834, 841 (8th Cir. 2021). But a severe instance can suffice. *Hales v. Casey's Marketing Company*, 886 F.3d 730, 735 (8th Cir. 2018); *see also, Lacour v. A & M Property Investment, LLC*, 2024 WL 2988961 at *9 (W.D. Okla. 28 May 2024) (collecting cases from other circuits).

The context is important. On the job, what happened in one or two moments must be evaluated against months or years of interactions. *Hairston*, 6 F.4th at 841. A home tour is a brief whole, often the only contact between a prospective tenant and the landlord. Ms. Horner didn't invite Mr. Warren's actions. Any reasonable woman would be offended by an unwelcomed touching of her breasts and a forced grazing of her hand across the prospective landlord's crotch. The accompanying words made the sexual motivation clear. Had Mr. Warren merely hemmed Ms. Horner in a corner, and made the lewd overture, but not done the touching, this encounter would have been offensive but not severe enough to violate the statute. *Compare DiCenso v. Cisneros*, 96 F.3d 1004 (7th Cir. 1996), *with Salisbury v. Hickman*, 974 F.Supp.2d 1282 (W.D. Cal. 2013). The unwelcome whole here, though, created severe hostile circumstances, depriving Ms. Horner of the opportunity to rent the house she preferred. Mr. Warren violated § 3604(b).

Ms. Horner also presses that the statement about her breasts violated 42 U.S.C. § 3604(c). Mr. Warren wouldn't have made it, she

argues, but for her sex.  This part of the statute forbids statements indicating any "preference, limitation, or discrimination based on race, color, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination."  Ms. Horner's lawyer candidly acknowledged that no precedent exists for applying this provision to Mr. Warren's words.  Those words were crude and offensive in the circumstances.  But they were not the legal equivalent of "Black folks need not apply" or "No, disabled tenants are too much trouble."  Ms. Horner's § 3604(c) claim fails as a matter of law.

She also raises an interference claim under 42 U.S.C. § 3617. "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged another person in the exercise or enjoyment of, any right granted or protected by Section 3603, 3604, 3605, or 3606 of this title."  Using her Section 8 voucher, Ms. Horner was exercising her 42 U.S.C. § 3604 right to rent a home free from discrimination because she's a woman. By sexually harassing her during the tour, Mr. Warren interfered with her statutory right to do so.  He violated this statutory prohibition, too.

Ms. Horner makes three echoing claims under the Arkansas Fair Housing Act, Ark. Code Ann. § 16-123-201, *et seq*.  These provisions are substantially similar to the Federal Housing Act.  Scant state precedent exists.  As it has done with the Arkansas Civil Rights Act, the Arkansas

Supreme Court would (I predict) look to federal precedent in interpreting this state law. *Muntaqim v. Payne*, 2021 Ark. 162, 5, 628 S.W.3d 629, 635; *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856 (8th Cir. 2010). This Court holds that Ms. Horner's Ark. Code Ann. § 16-123-204(a)(2) claim for sexual harassment and her Ark. Code Ann. § 16-123-206(c) interference claim also succeed; her Ark. Code Ann. § 16-123-204(a)(6) claim based on the remark also fails.

Ms. Horner also asserts common law battery. Mr. Warren intended to, and did, touch Ms. Horner in an unwelcome sexual way. That was a battery. *Relyea v. Director, Department of Workforce Services*, 104 Ark. App. 235, 238, 290 S.W.3d 34, 37 (2008); *Costner v. Adams*, 82 Ark. App. 148, 156, 121 S.W.3d 164, 170 (2003); HOWARD W. BRILL & CHRISTIAN H. BRILL, ARKANSAS LAW OF DAMAGES § 33:6 (Nov. 2025 update).

\*

The Horner/Warren encounter damaged Ms. Horner. She lost the opportunity to rent a good house in a convenient location. She ended up renting another house in north Jonesboro, a neighborhood both less desirable and less convenient. There's more crime there. Living in that house meant driving her son several miles back and forth to school instead of walking him across the street. The security deposit was three hundred dollars more. She had to pay it over time. The rent was fifteen dollars more each month, which she had to pay for the three years that

her family lived in north Jonesboro.  The encounter troubled her. She's seen a therapist off and on in the years since.  And she's been prescribed medication for anxiety.  She's more skeptical and wary of people.  For example, she didn't go inside the house she eventually rented. She viewed it from the front door and took the application back to her apartment to fill out.  She was uncomfortable being alone in the premises with the landlord.  Ms. Horner described her post-encounter attitude about the world as "overly careful."

To fairly compensate her for experiencing the sexual harassment and the battery, living with that experience, and the increased out-of-pocket expenses incurred by not getting the home on South Culberhouse (more gas, increased deposit, and more rent for an approximately three-year period), the Court awards $10,000 in compensatory damages.  42 U.S.C. § 3613(c);  Ark. Code Ann. § 16-123-210; *Maxwell v. Walser*, 296 Ark. 70, 751 S.W.2d 351 (1988). Ms. Horner's testimony about the resulting emotional distress suffices on that part of her claim. *United States v. Hurt*, 676 F.3d 649, 654 (8th Cir. 2012).  $10,000 in compensatory damages is the appropriate amount to make Ms. Horner whole, whether this case is considered solely as a battery in the housing context, solely as FHA/AFHA violations that included unwanted touching, or a combination of all the successful claims.

Punitive damages are also appropriate. Mr. Warner had been trained on sexual harassment at his last job. He knew unwanted touching and unwelcome sexual remarks were contrary to law. His actions and words show "reckless or callous indifference to the federally protected rights of [Ms. Horner]." *Quigley*, 598 F.3d at 953; *see also Badami v. Flood*, 214 F.3d 994, 997 (8th Cir. 2000). Considering his conduct, and the limited financial information provided, the Court awards $5,000. That amount will sufficiently punish and deter similar future conduct by him and other small-scale landlords.

\*

The last issue involves Mrs. Warren. Should the judgment be against her, too? Ms. Horner emphasizes that the Warrens owned the house on South Culberhouse together. They worked together in their rental business. No corporation or other entity was involved. They had what appeared to be a general partnership. All true, but insufficient.

Mrs. Warren doesn't have direct liability because she wasn't involved in the sexual harassment. 42 U.S.C. § 3604(b); 24 C.F.R. § 100.7.

The Fair Housing Act doesn't mention vicarious liability, but it's settled that the common law of agency supplements the statute. *Meyer v. Holley*, 537 U.S. 280, 285–86 (2003). The principal's liability for her agent's torts depends not on knowledge, but on whether the agent

–10–

was acting within the scope of his authority, actual or apparent. *Ibid*; RESTATEMENT (SECOND) OF AGENCY § 219 (Am. L. Inst. 1958).

Mr. Warren was acting for the family business when he showed the rent house. He was within the scope, seeking a tenant who would generate income for both himself and Mrs. Warren. RESTATEMENT (SECOND) OF AGENCY § 219(1). But his intentional torts in sexually harassing Ms. Horner, and committing battery, were beyond the scope of his authority. His behavior did not advance the Warrens' rental endeavors. Sexual harassment does not generally increase business, and had the opposite effect here. Mrs. Warren offered Ms. Horner the house and she never accepted.

There was no evidence Mrs. Warren intended or encouraged this behavior. RESTATEMENT (SECOND) OF AGENCY § 219(2)(a). None of the other settled exceptions apply. No evidence was offered that Mrs. Warren was negligent or reckless in allowing Mr. Warren to show the house alone. RESTATEMENT (SECOND) OF AGENCY § 219(2)(b). For example, there was no evidence received that Mr. Warren had propositioned potential or current tenants before. (The Court notes the hearsay statements in the HUD investigation report; the report was not admitted for its truth. Plus it's unclear whether Mrs. Warren even knew about those disputed events.) Ms. Horner doesn't assert that any non-delegable duty was involved. RESTATEMENT (SECOND) OF AGENCY § 219(2)(c); *compare Meyer*, 537 U.S. at 290. Mr. Warren didn't purport

–11–

to speak for Mrs. Warren in making the sexual overture and touching Ms. Horner.  He did all that for himself alone.  RESTATEMENT (SECOND) OF AGENCY § 219(2)(d).

The applicable FHA regulation provides: "A person is vicariously liable for a discriminatory housing practice by the person' agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law."  24 C.F.R. § 100.7.  Yes — for acts in the scope.   And the principal's knowledge is material to the qualifications on that rule of law.  *E.g.*, RESTATEMENT (SECOND) OF AGENCY § 219(2)(a)–(d) (Am. L. Inst. 1958).  Mrs. Warren has no liability under the FHA to Ms. Horner in the circumstances presented. The Arkansas Supreme Court would, this Court predicts, also so hold under the Arkansas Fair Housing Act and on the battery claim. *Regions Bank & Trust v. Stone County Skilled Nursing Facility, Inc.*, 345 Ark. 555, 566–67, 49 S.W.3d 107, 114–15 (2001).

So Ordered.

_____
D.P. Marshall Jr.
United States District Judge

_____9 July 2026_____

-12-